UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

CHICO'S FAS, INC., a Florida
corporation

       Plaintiff,

v.                                         Case No: 2:13-cv-792-FtM-38MRM

ANDREA CLAIR, ANASTASIOS
KOSKINAS and 1654754 ONTARIO,
INC.,

       Defendants.
_____/

### ORDER[1]

This matter comes before the Court on Plaintiff Chico's FAS, Inc.'s ("Chico's") Motion to Dismiss Defendants' Claims with Prejudice (Doc. #131) filed on October 8, 2015. Defendants 1654754 Ontario, Inc., Andrea Clair, and Anastasios Koskinas (collectively hereinafter referred to as "Wink") filed a Response in Opposition (Doc. #134) on October 26, 2015. The Court allowed Chico's to file a Reply (Doc. #136) on November 10, 2015, and Wink to file a Surreply (Doc. #137) on November 24, 2015. The matter is ripe for review.

### Background

This is a patent infringement action. Wink is a manufacturer and retailer of women's intimate apparel owned by Andrea Clair and Anastasios Koskinas. Clair and

---

[1] Disclaimer: Documents filed in CM/ECF may contain hyperlinks to other documents or websites. These hyperlinks are provided only for users' convenience. Users are cautioned that hyperlinked documents in CM/ECF are subject to PACER fees. By allowing hyperlinks to other websites, this Court does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their websites. Likewise, the Court has no agreements with any of these third parties or their websites. The Court accepts no responsibility for the availability or functionality of any hyperlink. Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the Court.

Koskinas founded the company after securing a design patent[2] for a combination brassiere and tank top. Over time, Clair and Koskinas secured two additional utility patents[3] covering the same design. All three patents were eventually assigned to Wink. From the patented design, Wink created the 9to5 Cami Bra – "the original cami bra."

Chico's is a corporation that specializes in women's apparel and sells intimate apparel through its Soma brand. Sometime in 2013, Chico's received a letter from Wink alleging Soma's Oh My Gorgeous Cami Bra infringed on all three of its cami bra patents. Convinced these allegations were false, Chico's initiated this action seeking a declaratory judgment that it was not infringing on the patents-at-issue and that those patents were invalid and unenforceable. Wink replied by asserting three counterclaims for patent infringement. After two years of litigation, the Court recently addressed the parties' cross-motions for summary judgment, finding each party was entitled to summary judgment in part. In Wink's favor, the Court found Chico's failed to produce any evidence illustrating the patents-at-issue were unenforceable on the basis of inequitable conduct. In Chico's favor, the Court found prior art invalidated a majority of the claims set forth in the utility patents and that a third-party, Beverly Johnson, was an inventor of the patents-at-issue rather than Koskinas.

After the Court issued these rulings, the parties raced to find Johnson and secure whatever rights she had, if any, in the patents-at-issue. Chico's "won" the race and obtained Johnson's past, present, and future rights. Having secured those rights, Chico's now avers that the Court must dismiss this action because Wink cannot sue a co-owner

---

[2] United States Design Patent No. D622, 478
[3] United States Patent Nos. 8,506,347 and 8,182,310

of the patents-at-issue for infringement. Wink argues that even if Johnson is a co-inventor, she abandoned any rights to the patents-at-issue in 2008.

## Discussion

There are many rights that a co-owner of a patent may enjoy unilaterally. *See, e.g.,* 35 U.S.C. § 262 ("[E]each of the joint owners of a patent may make, use, offer to sell, or sell the patent invention . . . without the consent of and without accounting to the other owners."). But bringing an infringement action is not one of those unilateral rights. A co-owner that brings an infringement action without the consent of all other co-owners lacks standing, and the action must be dismissed. *See STC.UNM v. Intel Corp.*, 754 F.3d 940, 946 (Fed. Cir. 2014). Granting one co-owner the ability to impede the other co-owners' infringement actions may seem unjust at times, but this rule serves an important purpose – it "protects . . . a co-owner's right to not be thrust into costly litigation where its patent is subject to potential invalidation." *Id.* at 947. The rule also "safeguards against the possibility that each co-owner would subject an accused infringer to a different infringement suit on the same patent." *Id.*

Like most rules, there are exceptions. The first exception involves an exclusive licensee. When the patent owner grants an exclusive license to a third-party, and the exclusive licensee brings an infringement action, the licensee may involuntarily join the patent owner to protect its rights. *See id.* at 946. The second exception involves a waiver. If a co-owner waives his right to refuse to join in an infringement action, then the remaining co-owners may involuntarily join him in that action. *See id.* Beyond these two exceptions, the fate of an infringement action rests in each co-owner's hands.

Wink does not dispute that if Johnson had rights to the patents-at-issue when she executed the assignment contract with Chico's, then Chico's is a co-owner of the patents and has the ability to impede this infringement action. Wink instead argues Johnson had no rights to assign. In support, Wink points to an agreement Johnson[4] executed with Clair in 2008, soon after the first patent application was filed. The agreement reads, in pertinent part:

> This agreement shall govern the conditions of disclosure by Wink Intimates by Andrea Clair to Beverly Johnson of certain "Confidential Information" including but not limited to Prototypes, drawings, data, trade secrets and intellectual property relating to "Patent Pending" invention named "**Foam Cup, Underwire Bra with Tank Top**" invented by Andrea Clair and Anastasios Koskinas/Wink Intimates by Andrea Clair.
>
> With regard to the Confidential Information, Beverly Johnson hereby agrees:
>
> . . .
>
> 4. That Beverly Johnson shall not directly or indirectly acquire any interest in, or design, create, manufacture, sell or otherwise deal with any item or product, containing, based upon or derived from the information, except as may be expressly agreed to in writing by Wink Intimates by Andrea Clair.

(Doc. #66-4) (emphasis in original). Focusing on paragraph 4 of the agreement, Wink avers Johnson abandoned any rights she had in the patents-at-issue under Canadian law.

Chico's disagrees. Chico's posits that federal law, not foreign law, governs assignments of patent ownership. And under federal law, Johnson did not assign her

---

[4] There is a dispute among the parties whether Johnson executed the agreement on her own behalf or on behalf of her company, 2020527 Ontario Inc. The Court need not resolve that issue today.

4

ownership rights to the patents-at-issue through the agreement. Chico's also explains that, even under Canadian law, this agreement is nothing more than a non-compete/non-disclosure that was entered into when neither party believed Johnson was an inventor. Without this shared belief, neither Johnson nor Clair could have intended that this agreement would serve as a means for Johnson to abandon her rights. Yet even if the Court somehow determined the agreement served this purpose, Wink fails to explain how it gained Johnson's rights and has standing to bring this action.

The Court must first determine whether federal law or Canadian law applies. Federal law is typically used to determine the validity and terms of a patent assignment. *See Sky Techs. LLC v. SAP AG*, 576 F.3d 1374, 1379 (Fed. Cir. 2009). But questions as to patent ownership that do not involve an assignment are governed by state law. *Id.* Applying these principles to the instant action, the Court finds Canadian law applies. Wink does not argue that Johnson assigned her rights through the agreement. Wink instead avers Johnson *abandoned* her rights. Because this argument alleges a transfer of patent ownership rights without an assignment, the Court would typically turn to state law. In this action, however, state law becomes Canadian law, as the agreement at issue was executed in Canada by Canadian citizens. *See Int'l Nutrition Co. v. Horphag Research Ltd.*, 257 F.3d 1324, 1329 (Fed. Cir. 2001) (finding French law should "determine who owned a United States patent pursuant to a French contract").

Having determined Canadian law applies, the Court must turn to Federal Rule of Civil Procedure 44.1. This rule allows the Court to consider any relevant material related to Canadian law, whether or not submitted by a party or admissible under the Federal Rules of Evidence. Fed. R. Civ. P. 44.1. Recognizing this ability, both parties submitted

5

legal opinions from Canadian law firms on whether Johnson abandoned her patent ownership rights through the agreement under Canadian law.  After close review of those legal opinions, the Court finds Johnson did not abandon her patent ownership rights when she executed the agreement with Clair in 2008.

Like most American states, Ontario provincial law employs a "practical, common sense approach" to contract interpretation that is "not dominated by technical rules of construction."  (Doc. #134-1 at 3).  This requires that the decision-maker "read the contract as a whole, giving words used their ordinary and grammatical meaning, consistent with the surrounding circumstances known to the parties at the time of formation of the contract."  (Doc. #134-1 at 3).  Determining the meaning of words involves "a number of contextual factors, including the purpose of the agreement and the nature of the relationship created by the agreement."  (Doc. #134-1 at 3).  The "overriding concern" of contract interpretation, however, "is to determine the 'intent of the parties and the scope of their understanding.'"  (Doc. #134-1 at 3) (citation omitted).  Neither party disputes these contract interpretation principles.

The parties do, however, differ as to the law governing abandonment.  Wink's Canadian counsel, Mark G. Biernacki, explains that while Canada has a federal statute that governs patents generally, "patent ownership is governed by the same provincial laws that govern personal property."  (Doc. #134-1 at 2) (citation omitted).  And patents, like any other personal property, are subject to abandonment "when there is 'a giving up, a total desertion, and absolute relinquishment . . . by the former owner.'"  (Doc. #134-1 at 2) (citation omitted).

6

Chico's Canadian counsel, Michael Crichton, disagrees with Biernacki. Crichton explains that common law abandonment applies only to chattels. (Doc. #136-1 at 6). As a perfect illustration of this point, all three abandonment cases cited by Biernacki involve tangible property, such as "restaurant equipment, bushels of soya beans, and farm machinery." (Doc. #136-1 at 6). There is not a single case applying common law abandonment to patents. (Doc. #136-1 at 6). Yet this should not be surprising, because "a patent is not a physical or tangible object or type of goods that may be possessed in the event that an original owner 'gives up', 'deserts' or 'relinquishes' it." (Doc. #136-1 at 6). A patent "is a chose in action and a form of intangible property incapable of being physically possessed." (Doc. #136-1 at 8). And the two limited instances where a chose-in-action patent may be abandoned – failure to maintain the patent application and dedication to the public – are not applicable here.

The Court need not decide whether common law abandonment applies to patents under Canadian law. Even accepting Wink's position that it does, a clear reading of the agreement as a whole reveals Johnson never abandoned her ownership rights. The agreement is titled "Non-Disclosure/Non-Compete Agreement." (Doc. #66-4). The language at issue governs the non-compete portion – providing Johnson "shall not directly or indirectly acquire any interest in, or design, create, manufacture, sell or otherwise deal **with any item or product**, containing, based upon or derived from the information." (Doc. #66-4) (emphasis added).

At the time Johnson entered into this agreement, no one thought she was a co-inventor. The parties viewed Johnson as the owner of a bra-making store/school that assisted Clair with developing her invention further. Concerned that Johnson might assist

other cami bra producers in the same manner using information gained during their relationship, Clair had Johnson execute the agreement. The language therein does not indicate in any way that Johnson maintained rights to the patents-at-issue. And it certainly does not indicate that Johnson was "giving up," "deserting," or "relinquishing" such rights. Johnson agreed to not design, create, manufacture, sell, or otherwise deal with competing items or products using information gained from Clair. Nothing more, nothing less.

Wink's arguments to the contrary are unpersuasive. Wink argues that the words "[a]ny 'item or product' cover intellectual property," including the patents-at-issue. (Doc. #134 at 6). As Biernacki explained, determining the meaning of words involves "a number of contextual factors, including the purpose of the agreement and the nature of the relationship created by the agreement." (Doc. #134-1 at 3). The purpose of this agreement is clear: Clair did not want Johnson discussing information gained during their relationship with others, or using that information to help others develop similar cami bras. The parties viewed their relationship as client and consultant, not co-inventors waiving ownership rights. It is not feasible to conclude that the parties intended "any item or product" to mean future patents.

Wink also argues, "Johnson's willingness to surrender a potentially valuable right to work the protected invention or design further demonstrates abandonment of all right, title, and interest." (Doc. #134 at 7). And by executing an agreement that named the inventors of the patents-at-issue as Clair, Koskinas, and Wink, Johnson "did not intend to retain any ownership interest in the U.S. Patents." (Doc. #134 at 7). These arguments assume Johnson considered herself to be a co-inventor of the patents-at-issue at the time the agreement was executed. But it has been established that she did not. In fact,

Johnson considered herself a co-inventor only after the Court ruled that she was, as a matter of law. (Doc. #128). Johnson could not have intended to abandon her ownership rights if not a single party to the agreement believed she possessed such rights.

Based on the foregoing, the Court concludes that Chico's is now a co-owner of the patents-at-issue and that Chico's has the right to prevent Wink from pursuing its infringement counterclaims further. Chico's unequivocally wishes to exercise that right. Without the consent of its co-owners, Wink lacks standing to pursue its infringement counterclaims, and those claims must be dismissed. See *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1468 (Fed. Cir. 1998) (finding infringement action must be dismissed where co-inventor granted alleged infringer an exclusive license along with its accompanying "right to sue").

Accordingly, it is now **ORDERED:**

1. Plaintiff Chico's FAS, Inc.'s Motion to Dismiss Defendants' Claims with Prejudice (Doc. #131) is **GRANTED**.

2. Defendants 1654754 Ontario, Inc., Andrea Clair, and Anastasios Koskinas' Counterclaims for Patent Infringement (Doc. #63) are **DISMISSED**.

3. On or before December 2, 2015, Plaintiff Chico's FAS, Inc. shall alert the Court as to how it wishes to proceed with its claims for non-infringement and invalidity.

**DONE** and **ORDERED** in Fort Myers, Florida, this 30th day of November, 2015.

SHERI POLSTER CHAPPELL
UNITED STATES DISTRICT JUDGE

Copies: All Parties of Record